**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gail Marie HAKLEY, Defendant–**
**Appellant.**

No. 02–2423.

United States Court of Appeals,
Sixth Circuit.

June 15, 2004.

Julie Ann Woods, Asst. U.S. Attorney, Raymond E. Beckering, III, U.S. Attorney's Office for the Western District of Michigan, Grand Rapids, MI, for Plaintiff–Appellee.

Paul L. Nelson, Federal Public Defenders Office, Grand Rapids, MI, for Defendant–Appellant.

Gail Marie Hakley, Fort Worth, TX, pro se.

Before SUHRHEINRICH, CLAY, Circuit Judges; and GWIN, District Judge.[*]

## OPINION

GWIN, District Judge.

On July 16, 2002, Gail Marie Hakley pled guilty to one count of identity theft in violation of 18 U.S.C. § 1028(a)(7). With this appeal. Defendant–Appellant Hakley challenges the district court's determination that she was not entitled to downward adjustments of her offense level for acceptance of responsibility. For the reasons that follow, we VACATE the decision of the district court and REMAND this matter for resentencing in accordance with this opinion.

## I. BACKGROUND

From August to December 2001, Gail Marie Hakley—under the alias Gail Sparks—worked as a home healthcare worker for Eleanor Belser in Grand Traverse County, Michigan. Ms. Belser hired Defendant Hakley to assist her with things that she was "physically unable to do because she was elderly and virtually blind." (J.A. at 118, ¶ 9).

With her work. Defendant–Appellant Hakley gained access to Ms. Belser's social security number. Defendant Hakley used Ms. Belser's social security number to apply for several credit cards. The defendant then used the cards on a shopping spree, including charging over $1,000 at Victoria Secret. Hakley also had access to Ms. Belser's personal identification number and she used that identification number to make unauthorized withdrawals from Ms. Belser's bank account. In total. Defendant Hakley fraudulently absconded with $7,746.72 of Ms. Belser's funds.

Ms. Belser's son, Charles Belser, discovered the suspicious credit card and ATM activity. On December 21, 2001, Mr. Belser filed a complaint with the Grand Traverse County, Michigan Sheriff's Department. Mr. Belser also confronted Defendant Hakley about her conduct. When confronted by Charles Belser, Defendant Hakley acknowledged her guilt and apologized.[1] In a note she left for the family after being fired, Hakley wrote: "No words can ever say how sorry that I am. I have a bad sickness and I am checking myself in for some serious help." (J.A. at 119, ¶ 13).

On January 8, 2002, an officer from the Grand Traverse, Michigan Sheriff's Department contacted Defendant Hakley for questioning. The officer did not put Defendant Hakley under arrest. During the questioning by the deputy sheriff, Defendant Hakley readily admitted to the credit card and ATM fraud. However, the fol-

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

1. Mr. Belser claims, however, that Defendant Hakley only confessed to part of her fraudulent activity, concealing the full nature of her identity theft.

lowing day, Defendant Hakley retained counsel and refused to make a written statement.

In February and March 2002, before any federal or state charges were brought regarding the theft from Mrs. Belser, Defendant Hakley stole two Social Security Administration checks made payable to her handicapped daughter, Rachel Sparks. Defendant forged her daughter's signature on the checks and cashed them to use the funds for herself. An investigation revealed that Defendant Hakley also had charged $1,266 to credit cards under the name Rachel Sparks.

On July 8, 2002, Defendant waived indictment in the instant matter and entered a not-guilty plea to a bill of information. Three days later, on July 11, 2002, Defendant notified the district court of her intent to plead guilty. The following week, on July 16, 2002 Defendant entered into a plea agreement and changed her plea to guilty. Pursuant to the plea agreement, Defendant Hakley pled guilty to one count of identity theft. In the plea agreement, the Government agreed it would neither recommend nor oppose Defendant's request for a reduction of her offense level under § 3E1.1 for acceptance of responsibility. In addition, pursuant to the terms of the plea agreement, the Government recommended that Defendant be sentenced at the low end of the guideline range.

The probation officer interviewed Defendant on July 31, 2002. When asked why she committed the instant offense, Defendant attributed the theft to a desire to provide for her children around the holidays after their father had committed suicide. Defendant also noted that she had a gambling addiction and "compulsive money disorder." Finally, Defendant stated that she knew that she had hurt her family and the family of the victim and that she was sorry for her behavior.

On October 22, 2002, a U.S. Probation Officer completed a Presentence Investigation Report. The probation officer reported that

33. when asked what possessed her to involve herself in the instant offense, Ms. Hakley stated she could not articulate why she committed the instant offense. However, Ms. Hakley did state it was Christmas, and she wanted to give her children material things. Ms. Hakley reported she had always felt the need to provide her children with material possessions after their father committed suicide.

34. Ms. Hakley reported she has a gambling addiction and a "compulsive money disorder." Ms. Hakley stated she has received help for her gambling issues, but she has not received assistance regarding her "compulsive gambling disorder."

35. Ms. Hakley stated she can say she is sorry numerous times, but she knows she cannot take back her actions. Ms. Hakley realized she has heard her children, her family, and the Belser family. Ms. Hakley reported her health and hyper-tension have worsened since being incarcerated.

37. During the presentence interview, Ms. Hakley was extremely emotional. This emotion, however, was not remorse but was more about being concerned for her own well-being and impending incarceration. Despite Ms. Hakley's token apologies, this officer does not believe she is sincere or sorry for how her actions have affected those around her. Based on Ms. Hakley's encounters with the judicial system, her actions are inconsistent with her words.

38. Based on Ms. Hakley's comments and her behavior, this officer does not

believe she has accepted responsibility for her conduct. Ms. Hakley consistently minimizes her behavior and is more concerned about herself and making excuses for her actions rather than being truly contrite.

(J.A. at 122, ¶¶ 33–38). Consequently, the officer recommended that Defendant Hakley not receive a reduction of her offense level for acceptance of responsibility. Defendant filed an objection to this finding.

At the time Defendant Hakley committed the offenses, she was on supervised release following a previous conviction for bank embezzlement. In June of 2001, Defendant Hakley violated her supervised release by failing to pay a fine, falsifying records, and submitting false documents to her probation officer. In March of 2002, officers arrested Hakley for a second violation of her supervised release, regarding the conduct involving Mrs. Belser. On March 28, 2002, a magistrate judge detained her. Defendant Hakley pled guilty to the second supervised release violation and was sentenced for that violation on November 20, 2002, the same day as the sentencing for the charges in this case.

The district court overruled Defendant Hakley's objection to the Presentence Report and did not reduce her offense level for acceptance of responsibility. On November 20, 2002, the court sentenced Defendant Hakley at a Total Offense Level of 16 and a Criminal History Category of II. which yielded a Guideline range of twenty-four to thirty months. Ultimately, the district court sentenced Defendant to twenty-four months of incarceration, followed by three years of supervised release. The

court ordered restitution payments totaling $11,008.72. In addition, for a violation of supervised release, the district court sentenced Defendant Hakley to ten months of incarceration, to run consecutively with the sentence imposed for identity theft.

On December 2, 2002. Defendant filed a timely notice of appeal as to the sentence for identity theft, but did not appeal the sentence for violation of her supervised release.

## II. LEGAL STANDARD

The district court's application of the sentencing guidelines is subject to a two-tier standard of review. We review the court's factual findings for clear error. *See United States v. Webb*, 335 F.3d 534, 537–38 (2003); *United States v. Lang*, 333 F.3d 678, 682 (6th Cir.2003); U.S.S.G. § 3E1.1., Note 5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review."). Meanwhile, questions of law are subject to *de novo* review. *See United States v. Miggins*, 302 F.3d 384, 390 (6th Cir.2002); *see also United States v. Tilford*, 85 Fed.Appx. 516 (6th Cir.2004); *United States v. Rodriguez–Trujillo*, 84 Fed.Appx. 621 (6th Cir.2003). The propriety of the application of the "acceptance of responsibility" reduction to uncontested facts—as is the case here [2]—is a legal conclusion, reviewed *de novo*. *See, e.g., United States v. Tilford*, 224 F.3d 865, 867 (6th Cir.2000) ("Generally, we review for clear error a district court's finding that a de-

---

2. The question of whether the district court relied on improper considerations is a legal question, not a factual matter. Even if Defendant Hakley admitted that the probation officer was correct in the assessment that Defendant's post-plea statements lacked sincerity and credibility, the district court never ruled that the credibility assessment alone was sufficient grounds for denying a downward departure. At issue here is whether, as a matter of law, the district court erroneously relied on pre-plea (and pre-arrest) conduct.

fendant is not entitled to a sentence reduction for acceptance of responsibility. However, the standard of review is *de novo* where, as here, the only issue presented is the propriety of the application of the reduction to uncontested facts.").[3]

## III. DISCUSSION

The Sentencing Guidelines provide for a two-level reduction in a defendant's sentence if the defendant "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). The "defendant has the burden of demonstrating by a preponderance of the evidence that a reduction for acceptance of responsibility is warranted." *United States v. Banks,* 252 F.3d 801, 806 (6th Cir.2001). In cases where the offense level is 16 or greater before the application of § 3E1.1(a), a district court may further reduce a defendant's sentence by another level if he assists the authorities in the investigation or prosecution of his own misconduct by either "timely providing complete information to the government concerning his own involvement in the offense [ ] or timely notifying authorities of his intention to enter a guilty plea, thereby enabling the government to avoid having to prepare for trial." U.S.S.G. § 3E1.1(b).

A defendant can demonstrate "significant evidence" of acceptance of responsibility if the defendant enters a guilty plea prior to trial and admits, or does not falsely deny, any additional relevant conduct. U.S.S.G. § 3E1.1, cmt., n. 3. The Commentary to § 3E1.1 lists eight factors that a court may consider in determining whether to give a reduction for acceptance of responsibility. Among the pertinent considerations are: "truthfully admitting the conduct comprising the offense(s) of con-

viction, and truthfully admitting or not falsely denying any additional relevant conduct," "voluntary termination or withdrawal from criminal conduct or associations," "post-offense rehabilitative efforts (e.g., counseling or drug treatment)," and "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." U.S.S.G. § 3E1.1, cmt., n. 1.

This court consistently has noted that "[a]n acceptance of responsibility adjustment is generally awarded to a defendant who admits guilt in a timely-entered guilty plea proceeding and may not be disallowed unless there is conduct clearly demonstrated in the record that is inconsistent with the defendant's specific acknowledgment of responsibility demonstrated by the guilty plea." *United States v. Truman,* 304 F.3d 586, 592 (6th Cir.2002); *see also United States v. Jeter,* 191 F.3d 637, 641 (6th Cir.1999) ("[W]e require that there be some conduct that the court can find is inconsistent with that specific acceptance of responsibility referred to in the commentary, namely the acceptance of the guilty plea.") (citing U.S.S.G. § 3E1.1, cmt., n.3).

However, the defendant may not receive the reduction if the defendant's outward manifestation of acceptance of responsibility is outweighed by other inconsistent conduct:

> Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under § 1B1.3 (Relevant Conduct) (see Application Note 1(a)), will constitute significant evi-

---

**3.** In the matter *sub judice,* this court considers whether the denial of acceptance of responsibility comports with the law and the Guidelines. *See* 18 U.S.C. § 3742(1), (2). Thus, the court has jurisdiction to review the appeal.

dence of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right. U.S.S.G. § 3E1.1. Application Note 3. It is notable that the Guidelines Application Note speaks only to inconsistent *conduct* in denying a defendant credit for acceptance of responsibility.

This case involves consideration whether conduct occurring before a defendant pleads guilty should be used to deny the acceptance of responsibility adjustment. Thus, the issue in the present case is the temporal scope of "conduct of the defendant that is inconsistent with such acceptance of responsibility." *See* U.S.S.G. § 3E1.1. Application Note 3. The Guidelines distinguish between the scope of the conduct that initially triggers the downward adjustment of the offense level for acceptance of responsibility and the conduct that may defeat the adjustment. The distinction is logical: Earlier conduct may suggest the applicability of the downward departure, and the only reason to doubt the departure's applicability would be *subsequent* inconsistent behavior. The law gives a criminal the chance to recognize the wrongful nature of the criminal conduct and to express contrition through accepting responsibility. The sincerity of the contrition cannot be impugned by behavior prior to the expression of the contrition. In other words, the failure to express sufficient contrition for past criminal acts (other than those for which the defen-

dant is currently facing prosecution) does not impeach a latter expression of contrition.

Much evidence suggests that Hakley accepted responsibility for her actions early-on: Before the federal government brought formal charges, Defendant Hakley told the government that she would plead guilty. She waived indictment. She agreed to provide restitution for all relevant conduct, not just the conduct related to the offense. At issue here is a question of law—whether the district court relied on impermissible considerations when determining that Defendant Hakley acted in a manner that was inconsistent with the aforementioned acceptance of responsibility.

The district court relied on four factors in concluding that Defendant Hakley had not accepted responsibility for her criminal conduct. First, the district court referenced Defendant Hakley's first violation of her supervised release. "[S]o that tells me that [at that] stage at least that either she was not sincere in expressing contrition or that life was too much for her and she just reverted to the life of crime." (J.A. at 100). Second, the court considered that Defendant Hakley stole Social Security checks from her daughter. "[T]hat's proof that in February 2002 Ms. Hakley was not accepting responsibility and was not contrite about what had happened." (J.A. at 102). Third, the district court reviewed the March 2002 discharge summary from Addiction Treatment Services, where Defendant Hakley was undergoing counseling from February 2000 until late March 2002, when she was detained.[4] The report indi-

4. The district court decided not to give any weight to an updated report, from the same source, which stated that, following the entry of her guilty plea, Defendant Hakley did appreciate the nature of her wrongdoing and responded to therapy. There was some con-

troversy regarding the fact that, in the second report, the counselor drew the conclusion that Hakley should not go to prison, instead of limiting her observations to Hakley's mental state. "I guess I have to decide that whether [sic] or not the writer of the report of

cated that the defendant did not appear to take responsibility for her behavior. "So March of 2002, assuming that the report is correct, we know the defendant has not accepted responsibility, nor is she contrite." *Id.* at 102–03. Fourth, the district court considered the finding of the probation officer that Defendant Hakley was not remorseful.

The factors relied upon by the district court call into question whether the district court improperly made a sentencing determination based upon the Defendant's pre-plea conduct. Almost exclusively, the court relied on events occurring before March 2002—prior to the defendant's waiving indictment and agreeing to plead guilty and even prior to her arrest for this conduct.

Three cases are on point in determining the relevant time frame for acceptance of responsibility. In *United States v. Jeter*, 191 F.3d 637 (6th Cir.1999), the defendant, Eddie Jeter, committed state crimes prior to his federal indictment and confession. The *Jeter* court noted that while "district courts have discretion in determining the time period for acceptance of responsibility, we do not believe they have unbridled discretion." *Id.* at 640. While the court declined "to adopt a bright-line rule" in *Jeter, id.* at 642, the court held that "the defendant must be on notice that the federal government has an interest in his or her affairs before § 3E1.1 comes into play." *Id.* at 639. Specifically, the court determined that Jeter was not on notice that the federal government would prosecute him until his indictment. Thus, this court concluded that the defendant's prior state crimes could not be a basis for denying him an acceptance of responsibility reduction. *Id.* at 639.

In *United States v. Tilford*, 224 F.3d 865 (6th Cir.2000), we refined *Jeter*'s holding, concluding that the relevant time frame for acceptance of responsibility determinations is the period subsequent to (i) the defendant being put on notice that the federal government has an interest in the defendant's affairs and (ii) the defendant actually accepting responsibility. *Id.* at 868. In that case, the defendant, Larry Eugene Tilford, was put on notice that the federal government was interested in his involvement in the filing of false tax claims when federal agents interviewed him in 1993 and informed him that they were investigating his tax return filings. Tilford initially agreed to cooperate with the investigation, but—much like the case at hand—changed his mind after consulting with his attorney during a break. Tilford continued to engage in fraudulent income tax schemes. On February 26, 1998, the United States charged Tilford for aiding and abetting in the filing of false tax claims. "That same day, pursuant to a written agreement, Tilford entered guilty pleas ..." *Id.* at 866. When examining the facts of *Tilford*, this court reasoned that the defendant had insufficient notice of the federal prosecution to deny him the § 3E1.1 reduction. Thus, we held that the district court erred in denying the defendant a reduction of his offense level for acceptance of responsibility based on conduct that had occurred before the 1998 indictment and guilty plea. *Id.* at 865–68.

Importantly, in *Tilford*, we referenced both the point of pleading and indictment as touchstones for establishing notice and acceptance of responsibility. "Based on the reasoning in *Jeter*, it is the period following the entry of Tilford's guilty pleas

---

the person describing herself as a counselor can be believed in either letter[;] I don't know how to resolve that at all. But I do know that in March this counselor said there was no acceptance of responsibility." (J.A. at 104).

[and indictment], not the period following the 1993 IRS interview, that is relevant for purposes of evaluating Tilford's acceptance of responsibility." *Id.* at 868. We noted that "to extend the denial of acceptance of responsibility reduction to similar criminal conduct *before the defendant has been arrested* on federal charges is to penalize the defendant for a criminal disposition, not because he has not accepted responsibility to the federally charged conduct." *Id.* (quoting *Jeter,* 191 F.3d at 641) (emphasis added).

To clarify when a defendant has accepted responsibility, this court has distinguished the facts in *Tilford* from an earlier, anomalous case—*United States v. Childers,* 86 F.3d 562 (6th Cir.1996). In *Childers,* the defendant confessed to postal workers in 1992 that he had stolen mail and altered checks. "He indicated that he was sorry for his actions, and that he was willing to make restitution." *Id.* at 563. The federal government did not initiate a prosecution or indict Childers for the postal offenses until two years later. During the intervening two years, Childers violated state law by passing bad checks and attempting to negotiate stolen and forged checks. The *Childers* court determined that Childers had accepted responsibility in the 1992 confession. Ultimately, the *Childers* court held that the district court properly considered the intervening state offenses as inconsistent behavior, suggesting that Childers did not merit a downward adjustment for acceptance of responsibility. *Id.* at 564. While *Childers* has not been overruled explicitly, we have limited its reasoning to the facts of the case and declined to extend it to other cases.

In *Tilford* and *Jeter,* we neatly fenced in the ruling in *Childers. Tilford,* 224 F.3d at 868. The facts in *Tilford* varied only slightly. This court found that, although Tilford was put on notice in 1993, "[u]nlike Childers, Tilford did not accept responsibility when the IRS agents first interviewed him." *Id.* at 867. This court has observed that "the relevant time period for measuring Tilford's acceptance of responsibility began with the entry of Tilford's guilty plea on February 26, 1998, which was, *importantly,* the date of his indictment." *United States v. Harper,* 246 F.3d 520. 526 (6th Cir.2001) (overruled in part on other grounds) (emphasis added). Further, *Jeter* distinguished *Childers* by holding that "the relevant time period for acceptance of responsibility does not begin until the date that federal authorities *indict* the defendant *and* he becomes aware that he is subject to federal investigation and prosecution." *United States v. Rodgers,* 278 F.3d 599, 601 (6th Cir.2002) (citing *Jeter,* 191 F.3d at 641) (emphasis added). *See also United States v. Smith,* No. 99–6025, 205 F.3d 1343, 2000 WL 145156, 2000 U.S.App. LEXIS 1481 (6th Cir. Feb.1, 2000) ("In *Jeter,* the court ruled that the relevant time period for an acceptance of responsibility could not begin until the date that federal authorities indicted the defendant *and* he became aware that he was subject to federal investigation and prosecution.") (internal quotations and citations omitted) (emphasis added). Thus, since *Childers,* this court has continued to stress the entry of the guilty plea and the indictment as pivotal to determining the moment at which a defendant first accepts responsibility. *Cf. United States v. Gregory,* 315 F.3d 637, 641 (6th Cir.2003) (holding that, even after engaging in conduct warranting an enhancement for obstruction of justice, the defendant should receive credit for acceptance of responsibility because "[a]ll of his obstructive conduct predated his indictment, and he has never denied his own responsibility and guilt.").

In a binding, published decision, the Sixth Circuit already has established the limited application of *Childers* in light of

*Jeter* and its progeny. *Rodgers,* 278 F.3d at 601. The matter is not before this court for the first time. In *Rodgers,* this court unequivocally clarified the status of the law: "In *Jeter* we held that the relevant time period for acceptance of responsibility does not begin until the date that federal authorities *indict* the defendant *and* he becomes aware that he is subject to federal investigation and prosecution." *Rodgers,* 278 F.3d at 601 (emphasis added). The dissent accuses the majority of creating new law when, in fact, binding precedent already exists. The dissent disagrees with the interpretation of *Jeter* present in *Rodgers* and argues for a more narrow interpretation. However, the dissent is arguing a moot point—this Circuit already has followed a more broad interpretation of *Jeter. See, e.g., Rodgers,* 278 F.3d at 601; cf. *Gregory,* 315 F.3d at 640.

The dissent encourages the majority to ignore *Rodgers* and instead follow *United States v. Webb,* 335 F.3d 534 (6th Cir. 2003). However, *Webb* dealt narrowly with an issue of applying the Guidelines to uncontested facts and applied a very deferential standard of review. Here, however, we face a case involving a contested issue of fact—whether Hakley was truly contrite. More importantly, this case centers around two issues of law: (1) the factors a sentencing court may consider in deciding whether to grant a reduction for acceptance of responsibility, and (2) the relevant time frame for considering acts inconsistent with an acceptance of responsibility. We review these *legal* issues *de novo, Webb* notwithstanding.[5] This Court has continually declined to apply *Webb* to cases, such as the matter *sub judice,* where the panel determines that an issue

of law is present. *See. e.g., United States v. Horn.* 355 F.3d 610, 613 (6th Cir.2004); *United States v. Tilford,* No. 02–5971, 85 Fed.Appx. 516, 518 (6th Cir. Jan.12, 2004); *Rodriguez–Trujillo,* 84 Fed.Appx. at 623.

However, even if we apply the dissent's proposed standard of review, we reach the same conclusion. Where a district court considers improper factors in making a factual determination, it commits clear error; indeed, it commits an abuse of discretion. *Paschal v. Flagstar Bank,* 297 F.3d 431, 434 (6th Cir.2002) ("An abuse of discretion exists when the district court applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.") (citation omitted). So, even if we were to determine that the clear error standard applies under *Webb,* we would reach the same conclusion because the district court applied the wrong legal standard by considering irrelevant information when it determined that Hakley had not accepted responsibility.

The dissent also takes issue with our reading of *United States v. Gregory,* 315 F.3d 637 (6th Cir.2003). The dissent correctly relates that the precise issue in *Gregory* was whether Gregory was entitled to keep his acceptance of responsibility despite obstructing the investigation of the crime for which he accepted responsibility. Yet, this distinction does nothing to undercut our position.

While incarcerated, Gregory received drugs from a relative. The Government charged Gregory with receiving drugs in prison. Shortly after he received the drugs, federal investigators interviewed

---

5. *Webb* states, "our standard of review of a district court's *application of provisions of the Sentencing Guidelines to the facts* should be treated deferentially and should not be disturbed unless clearly erroneous." 335 F.3d at 537 (emphasis added). Therefore, it does not disturb the oft-repeated rule that this Court reviews *de novo* a district court's rulings on issues of law.

Gregory and he admitted to swallowing three balloons filled with drugs. The interview took place in March of 2000. On May 10, 2000. Gregory phoned a woman and told her not to talk to anyone about the charges or to admit anything. The following day, on May 11, he sent a letter and a card to his sister, who had brought him the drugs, telling her not to cooperate with the government. Also on May 11, he spoke to FBI officials again, but never mentioned the letter he sent earlier that day. Sometime during this interview. Gregory called his sister. In contrast to his earlier recommendations to her, he urged her to cooperate with FBI officials, and put an FBI agent on the phone with her.

At sentencing, the court ruled that Gregory attempted to obstruct justice by telling others not to cooperate. As a result of this obstruction, the Court enhanced Gregory's sentence under Guideline § 3C1.1. That Guideline directs that a party receiving an enhancement under § 3C1.1 is presumed not to be entitled to receive a reduction for acceptance responsibility. Indeed, only in "extraordinary circumstances" may a defendant receive both a § 3C1.1 enhancement and a reduction for acceptance of responsibility.

On appeal, this Court determined that this case was "extraordinary" and decided that Gregory was entitled to a reduction for acceptance of responsibility. In so holding, the panel noted: "All of [Gregory's] obstructive conduct predated his indictment[.]" *Id.* at 641. If pre-indictment obstruction of justice related to Gregory's *charged offense* is insufficient to remove his case from the realm of the "extraordinary," then certainly Hakley's pre-indictment theft cannot be sufficient to nullify her acceptance of responsibility.

*Gregory* supports our conclusion in another way, as well. The dissent states that because Hakley was on supervised release she knew that the federal government was interested in her illegal conduct. Setting aside the obvious fact that the federal government is *always* interested in citizens' illegal conduct, the dissent assumes that Hakley's supervised release status put her on notice of the federal government investigation and likely prosecution, thus rendering her early apologies as the relevant acceptance of responsibility. If supervised release were sufficient to put one on notice of likely prosecution, then certainly incarceration would be. Yet, in *Gregory,* this Court never employed such an analysis.

Moreover, allowing a district court to deny credit for acceptance of responsibility, without a specific finding of inconsistent conduct, would denigrate the purpose of the Sentencing Guidelines. The Guidelines were established to promote judicial efficiency and consistency. Within this framework, § 3E1.1 plays an important role in encouraging plea agreements. Pleas reduce unnecessary trials and conserve judicial resources. *See Corbitt v. New Jersey,* 439 U.S. 212, 222–223, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978). Through pleas, the government saves trial costs and avoids the risk of acquittal. In exchange, defendants gain some predictability regarding their sentences. A sentence reduction for acceptance of responsibility serves this purpose.

The dissent would obliterate this incentive structure. Under the dissent's reasoning, a court could rely on past bad acts without review—framing them as evidence of a defendant's present inability to fully accept responsibility for the criminal conduct at issue. However, the Guidelines already factor prior criminal acts into a defendant's sentence calculation. A court is not permitted to rely on a defendant's past bad acts to deny the defendant credit for acceptance of responsibility. *Cf. Unit-*

*ed States v. Morrison*, 983 F.2d 730, 734–5 (6th Cir.1993); *United States v. Banks*, 252 F.3d 801, 806 (6th Cir.2001) ("[T]he denial of a sentence reduction based on a defendant's general criminal disposition has been expressly rejected by the Sixth Circuit.").[6]

Further, the Guidelines also aim to promote consistency in sentencing determinations:

> Although district courts need a great deal of discretion when making sentencing determinations, we must require of district courts a level of consistency in sentencing defendants. If we permit different judges to disregard the guidelines and accept various events as triggering the critical date for evaluating acceptance of responsibility, we will not achieve this level of consistency.

*Jeter*, 191 F.3d at 640. Despite the dissent's assertions, lower courts do not have unbridled discretion in their acceptance of responsibility determinations.

Ultimately, district courts are bound to follow *Jeter* and its progeny. *See Rodgers*, 278 F.3d at 601. However, the district court in the matter *sub judice* did not apply this precedent. Instead, the court assumed that it could focus almost exclusively on events on or before March 2002, well before Hakley pled guilty. Yet, Defendant Hakley did not enter a guilty plea until July 16, 2002—four months later. Defendant Hakley's January 8, 2002 confession to a state law enforcement official did not put Defendant on notice that federal authorities were interested in her affairs. First, it is undisputed that Defendant Hakley's January 8, 2002 confession was to a state and not a federal officer. *Cf. United States v. Holland*, 1 Fed. Appx. 266, 268 (6th Cir.2001) ("Holland's encounter at the airport may not have put him on notice that the federal government had an interest in his subsequent drug activities. We do not know whether any of the officers that he encountered were federal officers or, if they were, whether they identified themselves to Holland as such."). Second, the record also indicated that the officer did not place Hakley under arrest during this initial interview. Third, *Jeter* and its progeny indicate that acceptance of responsibility generally does not occur until entry of a plea, which did not occur until July 16, 2002.

*Jeter* and its progeny emphasize the importance of the entry of the guilty plea and the point of indictment as the relevant time frame for notice and acceptance of responsibility. Given this controlling precedent, the district court erred by relying almost exclusively on events occurring at least four months prior to Defendant's entry of her guilty plea.[7]

---

**6.** The dissent does not preserve defendants' rights not to be punished for their general criminal disposition. The dissent goes as far to conclude that being on supervised release puts defendants on notice of the federal government's interest in their affairs. Under this logic, a defendant who violates supervised release never has an incentive to plead guilty and assist the government. Instead, the dissent would authorize the courts to *carte blanche* deny acceptance of responsibility credit to all defendants who violate their supervised release.

**7.** There is no reason to believe that the sentencing assessment would have been the same without the erroneous consideration of pre-plea conduct. Absent a clear statement from the sentencing judge that a permissible ground for denying the adjustment was sufficient to support the sentencing, this court cannot assume that the erroneous considerations-which were prominent in the sentencing decision-were moot. *See Williams v. United States*, 503 U.S. 193, 203, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992) (if a district court misapplied sentencing guidelines, appellate court should remand unless it concludes under harmless error doctrine that

To the extent the district court relied on factors other than pre-plea conduct, it also erred. As we noted above, the district court considered the discharge summary from Addiction Treatment Services and the findings of the probation officer in the presentence report. Yet, these sources contain no information about the defendant's *conduct*; instead, they contain other people's conclusions regarding her *mental state*, i.e., whether she was actually contrite. Such considerations are improper because they fall outside of the Guideline provisions. Under the Guidelines, the Court may consider *"conduct of the defendant* that is inconsistent with [ ] acceptance of responsibility." U.S.S.G. § 3E1.1, Application Note 3 (emphasis added). The Guidelines say nothing about relying upon the impressions of other people regarding the defendant's mental state.

Apparently, the dissent would allow district court judges to become metaphysicians, reading into the hearts and souls of defendants. However we do not believe the Guidelines intended district judges to rely upon impressions, impressions not grounded in statements or acts. to read a defendant's mind. Instead, we believe that the trial court's role is to determine from the defendant's *own objective actions and statements* whether he has outwardly expressed contrition. Thus, we VACATE

the sentence and REMAND the case for resentencing. In addition to determining whether Defendant Hakley is entitled to a two-level reduction for acceptance of responsibility, the district also shall consider whether it should reduce Defendant's sentence by another level for "timely providing complete information to the government concerning [her] own involvement in the offense [ ] or timely notifying authorities of [her] intention to enter a guilty plea, thereby enabling the government to avoid having to prepare for trial." U.S.S.G. § 3E1.1(b).

## IV. CONCLUSION

For the forgoing reasons, the sentence of the district court is VACATED and the case is REMANDED for resentencing in accordance with this opinion.

SUHRHEINRICH, Circuit Judge, dissenting.

This case is easily resolvable; the district court made a credibility determination that Hakley was not truly contrite and denied a reduction for acceptance of responsibility accordingly. Its factual finding that Hakley had not accepted responsibility was not clearly erroneous; the matter should have ended there because this issue is not cognizable on appeal.[1]

---

district court would have imposed the same sentence if it had applied the guidelines properly).

The dissent speculates that, relying on post-plea conduct, the district court would still deny credit for acceptance of responsibility. This, of course, is unsupported. We are remanding, and not reversing, because we do not know how the district court judge would have ruled absent the impermissible considerations.

1. The appeal was brought pursuant to 18 U.S.C. § 3742, which provides four grounds on which a defendant may appeal an otherwise final sentence. Applying this section, we

have consistently held that "a district court's failure to depart downward is not cognizable on appeal when the guideline range is properly computed, the court is aware of its discretion to depart downward, and the sentence does not violate the Guidelines or federal law." *United States v. Moore,* 225 F.3d 637, 643 (6th Cir.2000). We have applied this jurisdictional standard in cases where the district court refused to depart downward or grant credit for acceptance of responsibility. *See United States v. Bearden,* 274 F.3d 1031, 1038–39 (6th Cir.2001) (refusing to review the district court's denial of downward departures for health and acceptance of responsibility); *United States v. Draper,* 888 F.2d 1100,

The majority, however, misperceives the nature of the district court's holding and reverses on the grounds that the district court relied on impermissible legal factors. Because I believe the district court properly applied the guideline provision, and made a factual determination that was not clearly erroneous, I DISSENT.

## I.

I revisit the facts of this case because they are integral to the credibility assessment made by the district court.

In late summer of 2001, Hakley began work as a home healthcare worker for Eleanor Belser, an elderly woman. Since Hakley had a criminal background, she was considered a risk. Therefore, the Probation Department contacted Ms. Belser to advise her of Hakley's criminal record. On September 7, 2001, in the presence of Hakley, the probation officer spoke with a woman, purporting to be Ms. Belser, regarding Hakley's criminal past. Then on September 14, 2001, the Probation Department received a letter, allegedly from Ms. Belser, indicating her awareness of Hakley's criminal records and taking full responsibility for her employment.[2]

On December 21, 2001, Charles Belser, Eleanor's son, contacted the Grand Traverse County, Michigan Sheriff's Department regarding Hakley's use of Ms. Belser's social security number to obtain credit from various companies. Mr. Belser reported to police that he confronted Hakley regarding the credit card fraud and asked her to return the credit cards. Hakley admitted that she had used Ms. Belser's social security number and gave Mr. Belser three credit cards she had obtained.

Mr. Belser also indicated that Hakley apologized to him and gave him the keys to Ms. Belser's apartment. Shortly thereafter. Hakley left a note under the door of Ms. Belser's apartment with another key. The note read

Dear Anne and family. No words can ever say how sorry that I am. I have a bad sickness and I am checking myself in for some serious help. I'm very sorry that it had to end like this. I just hope someday you all can forgive me. Please tell Jane I want to try and make this right. Please let me know what I need to do. Anne I'm so sorry. Thanks Gail.

On January 8, 2002, Hakley was contacted by an officer of the Grand Traverse, Michigan, Sheriff's Department. The officer advised Hakley that she was not under arrest and was free to leave at any time. Hakley indicated that she understood and agreed to speak with the officer. She then admitted that she had received several credit cards using Ms. Belser's social security number and that she had made several withdrawals using Ms. Belser's ATM card. After making her confession, Hakley indicated that she needed to leave for a doctor's appointment but would return the next day to make a written statement. Later that day, however, she contacted the officer and advised that, on the advice of an attorney, she would not be returning to make a written statement.

In February and March 2002, Hakley stole two Social Security Administration checks made payable to her disabled

1105 (6th Cir.1989) (refusing to review the district court's denial of departures when Appellant asserted on appeal that "he should not have been considered the leader of the criminal enterprise, that credit should have been given for his acceptance of responsibility, and that his prior convictions were misapplied in determining his sentence").

2. Charles Belser denies that his mother wrote the letter to the Probation Department.

daughter, Rachel Sparks. She forged her daughter's signature on the checks and cashed them to obtain funds for herself. Subsequently, in October 2002, Sparks reported that her mother applied for and received several credit cards in Sparks's name, without Sparks's permission. Sparks also stated that in Spring of 2002, she noticed that her driver's license and automated teller machine card were missing. When Sparks confronted Hakley, she returned them.

At the time Hakley committed the foregoing offenses, she was on supervised release following a previous conviction for bank embezzlement. Hakley was arrested in March 2002 for violating the terms of her supervised release. On March 14, 2002, a second supervised release violation report was filed involving the same facts as the present case.[3] On March 27, 2002. Hakley appeared before the magistrate judge for her second supervised release violation. She was ordered detained as a serious risk to the community. Hakley pled guilty to the supervised release violation and was sentenced for that violation on November 20, 2002, the same day as the sentencing for the charges in this case.

An Information was filed in the United States District Court for the Western District of Michigan on July 2, 2002. On July 8, 2002, Hakley entered a plea of not guilty and waived indictment. Then, on July 11, 2002, Hakley notified the district court of her intent to plead guilty. A change of plea hearing was held on July 16, 2002.

Hakley pled guilty to one count of identity theft in violation of 18 U.S.C. § 1028(a)(7). In the plea agreement, signed July 16, 2002, the Government agreed not to oppose Hakley's request for a reduction of her offense level for accep-

tance of responsibility under § 3E1.1, and further to recommend that Hakley be sentenced at the low end of the guideline range. The Government did not agree to recommend a reduction for acceptance of responsibility.

The probation officer interviewed Hakley on July 31, 2002. When asked why she committed the instant offense. Hakley stated that she had a gambling addiction and a "compulsive money disorder." The presentence report also noted that Hakley stated that she was sorry, and that she realized that she had hurt her children, her family, and the Belser family. The probation officer further reported in pertinent part that:

37. During the presentence interview, Ms. Hakley was extremely emotional. This emotion, however, was not remorse but was more about being concerned for her own well-being and impending incarceration. Despite Ms. Hakley's token apologies, this officer does not believe she is sincere or sorry for how her actions have affected those around her. Based on Ms. Hakley's encounters with the judicial system, her actions are inconsistent with her words.

38. Based on Ms. Hakley's comments and her behavior, this officer does not believe she has accepted responsibility for her conduct. Ms. Hakley consistently minimizes her behavior and is more concerned about herself and making excuses for her actions rather than being truly contrite.

Therefore, the probation officer recommended that Hakley not receive a reduction for acceptance of responsibility.

The presentence report also noted that Hakley had been attending counseling at

---

**3.** Hakley's first supervised release violation was in June 2001. Probation records reflect that she failed to pay her fine, falsified her community service and Gamblers Anonymous records, and submitted false documents to her probation officer.

Northern Michigan Alcoholism and Addiction Treatment Services (NMAAT) from February 1, 2000, to March 27, 2002. The presentence report indicated that NMAAT records reflected that Hakley had a gambling addiction and that she was "very open to receiving counseling for her addiction in order to remain abstinent." (J.A. 128). On March 27, 2002, Hakley was discharged from NMAAT. The discharge summary, prepared by Ellen Lord, apparently indicated that Hakley had received both individual treatment and group therapy for her addiction. Lord apparently reported that Hakley

> relapsed twice with gambling and other irresponsible financial behaviors during the course of her treatment. Ms. Hakley was unable to break through her personal denial system and tended to view herself as victimized by life and relationships. Ms. Hakley did not appear to take responsibility for irresponsible behaviors. She remained superficial in group interaction and ambivalent in individual therapy. Ms. Hakley was also unable to grasp the 12–step philosophy.

On October 25, 2002, the district court received a letter from Lord on behalf of Hakley. Lord's letter stated in pertinent part:

> Gail has asked me to provide a recommendation on her behalf. She has been receiving individual and group counseling services with our agency since February, 2000. . . . She initially presented with a high level of denial regarding her gambling addiction and inability to handle personal finances and other stressors with her children. Throughout the course of her participation with counseling she would vacillate between sincere investment in her recovery and ambivalence. Her best work was accomplished last year when she was on tether. I was

dismayed to learn that she relapsed again and incurred new charges. I see Gail as a stress-sensitive and unhappy woman. Her self-esteem has been low and she has attempted to gain self worth by accumulating "things" for herself and her children. . . .

> Gail has maintained contact with me since her incarceration and I met her a few weeks ago when she was home on medical leave. I was pleased at the transformation that she seems to have made. It appears that the reality of incarceration has had a very positive effect on her motivation to take responsibility for her actions and commit to a healthier lifestyle. She was open and spontaneous during our session. She was able to take full responsibility for her illegal actions and showed a great deal of remorse. She acknowledged the need for continued recovery support and structure. She also discussed her medical problems, which I feel are severe, chronic, and stress related.

> . . . .

> I do not see Gail as a social predator. I believe that she has the ability and desire to change her prior self-defeating thought, feeling and behavior patterns with the assistance of on-going mental and physical therapeutic support.

The district court held the sentencing hearing on November 20, 2002. Several witnesses testified at the hearing, including Charles Belser. In holding that Hakley was not entitled to a reduction for acceptance of responsibility, the district court stated in relevant part:

> The problem the Court, a judge faces in assessing the acceptance of responsibility and the contrition that a defendant expresses at sentencing, sometimes that comes in a letter, sometimes it comes in a letter and orally, is that the Court is unable to see into the mind and heart

and spirit of a person because the Court's discipline does not include psychiatric training or psychological training. I suspect if it did, it would be difficult.... The problem of a judge, of course, is how does the judge decide that? What does the true person— What does the truly contrite person do that separates him or her from the person who is not truly contrite or vice versa. And I'm fond of telling—not fond, but I'm forced to tell defendants oftentimes all I have is past record, because I believe not only is everybody contrite who is sitting here on sentence day, I believe everybody intends to rid themselves of their addiction, they are not falsely telling me.... [T]he real problem is how will they act then. That's my job in terms of protecting society as I try to balance that with being fair to the defendant.

Here we have got a woman that first appeared in my life a couple of years ago as an embezzler for a bank.... And like many embezzlers—and this case I looked at the pre-sentence report, I looked at her past criminal history. I've looked at her background, and I concluded that she should serve one day, which really means that I concluded she should not serve any time because I gave her credit for time served....

There were terms of her supervised release that seemed to me obvious. She had told me she had a gambling addiction, she obviously owed the bank money, she owed a fine and so forth. Now a few months later she violated that supervised release, so that tells me that stage at least that either she was not sincere in expressing contrition or that life was too much for her and she just reverted to the life of crime....

And then what happens, she's on a tether because she's not to be trusted. And when she—and she performs as the pre-sentence report explains admirably and then the tether is taken off and she returns or continues a life of crime, this time getting a peculiarly vulnerable victim, an old lady who can't see very well, and she's caught by the, basically by the son who had received a communication from a credit card company and realizes there was something wrong and he confronts the defendant that it's her responsibility and even leaves a note under the door step—under the door, bottom of the door in which she apologizes to the mother—I'm sorry, to the victim and to the victim's daughter or sister, Jane, whoever Jane is. And couple months go by and in those two months she finds another victim, her daughter, and here she steals Social Security checks, she uses false identification, so the point is this: If Mr. Belser would say in December: Well, is she contrite, is she really sorry in February, he would have said: No, she is not really sorry, she's found another victim, her own daughter. Talk about vulnerability, a stranger who is an old lady and all of a sudden a dependent—or young daughter, that's proof that in February 2002 Ms. Hakley was not accepting responsibility and was not contrite about what had happened. She said she's contrite, but she isn't contrite at least in February.

Do we have any other evidence about her contrition? Yes, we do. We have a discharge summary by Addiction Treatment Services, Incorporated in March of 2002 in which the following language is used by the discharging counselor: She relapses twice—I take that to be intended as a D for the S, I don't know what relapses would mean, I think she means relapses twice from gambling and other unresponsible behaviors during the course of her treatment. She was unable to break through her personal deni-

al system. She tended to see herself as a victim and she did not appear to take responsibility for irresponsible behavior. She remained superficial in group interaction and ambivalent in individual therapy. She was unable to grasp the twelve step philosophy.

Now, that's essentially the entire commentary under a word called Summary, that's March. So March of 2002, assuming that the report is correct, we know the defendant has not accepted responsibility, nor is she contrite. Now the same woman writes a letter. I have seen it, I don't think I've got it in front of me, in which she essentially reverses her appeal and says that, in fact, Ms. Hakley does understand the nature of her wrongdoing and is responsive to therapy and should not go to prison or jail because that's not the place to treat somebody with her problems.

. . . .

Well, what I do [sic] make of all that? I guess I have to decide that whether or not the writer of the report of the person describing herself as a counselor can be believed in either letter, I don't know how to resolve that at all. But I do know that in March this counselor said there was no acceptance of responsibility.

Lastly, the district court noted that the probation officer found that Hakley "rationalized her criminal conduct by deflecting blame onto her gambling addiction and 'compulsive money disorder.'" (J.A. 104; internal quotation marks omitted). The court referred specifically to paragraphs 37 and 38 of the presentence report. The court added that this was the probation officer's impression in July 2002, when the report was written, and also in October 2002 when the court received it. The court therefore concluded:

Two things I have to say about all that I've just said: One is that a judge can hardly make a decision based on anything other than the past history, particularly recent past history in determining whether or not a defendant has accepted responsibility; and secondly, to proclaim that I am not a psychiatrist or psychologist and I cannot even pretend to understand why she would have done this behavior. . . . [Defendant] appears to have emotional problems. I don't know what to label them, I wouldn't label any of them money disorder, but she's not as well as I wish she were. I don't know what that means either. But I do know it tells me she has not accepted responsibility and to me it's about as clear as any I've had with that question was up in the air. *She's done the things on the surface look like accepting responsibility, admitting the crime, making an early decision to plead guilty, telling the authorities everything that happened, but the person herself is not even close to accepting criminal responsibility or being concerned about what she's done in any other way.*

## II.

As the district court's comments reveal, the court was trying to look into the "heart and mind and spirit" of Hakley to determine whether she was *truly* contrite. Indeed, the district court was *required* to make this inquiry because Hakley herself had objected to the probation officer's recommendation, based on the probation officer's credibility assessment, in the presentence report that Hakley not receive the acceptance of responsibility reduction because she was not truly contrite. *See* Fed. R.Crim.P. 32(i)(3)(B) ("At sentencing, the court: ... must—for any disputed portion of the presentence report or other contro-

verted matter—rule on the dispute ...").[4] Specifically, Hakley objected to paragraph 37 of the presentence report, arguing that the paragraph "places no weight whatsoever on [her] dealings with the Belser family, with local law enforcement officers, and with the government." She further argued that "[e]ven assuming, *arguendo*, that [she] cried crocodile tears during the presentence interview, every other action she has taken with respect to the charges in this case establishes acceptance of responsibility." Pursuant to Fed.R.Crim.P. 32, the district court was required to rule on the dispute in response to this objection and make findings of fact.

As required by Rule 32, the district court found, *as a matter of fact*, that Hakley had a history, not of criminal behavior, but of lying, which led it to the ultimate conclusion that she was not truly sorry now, despite what she had said. The court found that in June 2001 she had violated her supervised release for embezzlement, reasoning that at that "stage at least that either she was not sincere in expressing contrition or that life was too much for her. ..." The court found that she had been caught stealing from her employer and had apologized but immediately thereafter began stealing from her daughter. The court found her behavior proof that "in February 2002 Ms. Hakley was not accepting responsibility and was not contrite about what had happened. She said she's contrite, but she isn't contrite." It further found that she was insincere in her rehabilitative efforts and insincere in her post-plea interview with the probation offi-

cer, noting that "as recently as last month, the probation officer believed that the defendant had not accepted responsibility and was not contrite."

Contrary to the majority's assertion, the district court considered past conduct for the sole purpose of determining whether it *believed* Hakley's current protestations of contrition. The district court concluded that, based on her history of crying "Wolf," it did not. Thus, the district court denied Hakley's objection to the recommendation of the presentence report because it found that despite her surface behavior "the person herself is not even close to accepting criminal responsibility or being concerned about what she's done in any other way."

This factual finding is entitled to great deference as the Guideline commentary makes crystal clear: "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. *For this reason, the determination of the sentencing judge is entitled to great deference on review.*" U.S.S.G. § 3E1.1, cmt. n. 5 (2000) (emphasis added). Furthermore, the "court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous. ..." 18 U.S.C. § 3742(e) (2000).

Indeed, the majority cannot argue that the district court clearly erred in finding that Hakley had not accepted responsibility. Instead, the majority reclassifies the issue as a legal question and chastises the

---

**4.** Rule 32(i)(3) replaced Rule 32(c)(1). Rule 32(i)(3) clarifies that only controverted matters that will affect sentencing require a ruling. The substance of the rule, however, is the same. *See U.S. v. Darwich*, 337 F.3d 645, 666 (6th Cir.2003) ("On December 1, 2002, amendments to the Federal Rules of Criminal Procedure replaced Rule 32(c)(1) with Rule 32(i)(3). ... The new rule makes clear that controverted matters at sentencing only require a ruling if the disputed matter will affect the eventual sentence. Prior to these revisions, we already had interpreted the rule in a manner consistent with Rule 32(i)(3)'s recent clarification.") (citation omitted).

district court for relying on "improper considerations," namely any pre-plea behavior, in making its decision. The majority concludes that "the district court erred by relying almost exclusively on events occurring at least four months prior to Defendant's entry of her guilty plea." Maj. Op. at 131. In reaching this conclusion, however, the majority applies Sixth Circuit precedent in a manner inconsistent with the Guidelines.[5]

## III.

The majority identifies four factors relied on by the district court in making its determination: (1) Hakley was on supervised release for bank fraud when she committed the identity fraud; (2) Hakley stole Social Security checks from her daughter; (3) a March 2002 discharge summary from Addiction Treatment Services, where Hakley underwent counseling; and (4) the findings of the probation officer in the presentence report. Maj. Op. at 127. The majority then states that the "factors relied upon by the district court call into question whether the district court improperly made a sentencing determination based upon the Defendant's pre-plea conduct." Id.

The majority accuses the district court of employing the wrong time frame for determining acceptance of responsibility, or more precisely, the wrong "time scope of conduct of the defendant that is inconsistent with such acceptance of responsibility." Maj. Op. at 127 (quotation marks and citation omitted). In its analysis, the majority relies primarily on a line of three cases United States v. Childers, 86 F.3d 562 (6th Cir.1996);[6] United States v. Jeter, 191 F.3d 637 (6th Cir.1999);[7] and United States v. Tilford, 224 F.3d 865 (6th Cir.2000).[8] Significantly, neither the

---

**5.** The majority cites United States v. Tilford, 224 F.3d 865, 867 (6th Cir.2000) for the proposition that the propriety of the application of the acceptance of responsibility reduction to uncontested facts is reviewed de novo. Tilford has been abrogated on that precise point. See United States v. Webb, 335 F.3d 534, 538 (6th Cir.2003).

**6.** In Childers, the defendant was suspected of stealing mail from collection boxes and was questioned by postal inspectors. The defendant confessed but was not indicted for another two years. After his confession but prior to indictment, the defendant was arrested and convicted several times in state court for passing bad checks and attempting to negotiate stolen and forged checks. This Court held that it was proper for the district court to consider Childer's criminal offenses committed after his confession but before his arrest because his actions indicated that he "did not voluntarily terminate or withdraw from criminal conduct after, in 1992, he truthfully admitted to the postal inspectors the conduct constituting the offense of conviction." U.S. v. Childers, 86 F.3d 562, 563 (6th Cir.1996). In rejecting the defendant's argument that the only relevant acceptance of responsibility took

place after his arrest in 1995, this Court stated "[n]owhere do the guidelines state, or even suggest, that the only relevant 'acceptance of responsibility' is that which follows arrest for the offense of conviction." Id. at 564.

**7.** In Jeter, the defendant was arrested and indicted on state charges for fraudulent loan transactions. Subsequently, he continued to engage in similar conduct. The trial court based its denial of acceptance of responsibility on the defendant's continued criminal activity after his arrest on state charges. This Court held that the defendant's state criminal activity could not be used to impeach his acceptance of responsibility because he was not on notice that he would be federally prosecuted. U.S. v. Jeter, 191 F.3d 637, 641 (6th Cir.1999).

**8.** In Tilford, the defendant was engaged in a fraudulent income tax scheme. In 1993, he was interviewed by IRS agents, who informed him that his tax return filings were under investigation. Tilford initially agreed to cooperate but later refused responsibility. He continued to engage in similar criminal activity. When he was finally indicted approximately four years later, Tilford pled guilty.

Guidelines nor these cases provide any justification for creating, as the majority effectively does, a bright line rule limiting the sphere of relevant conduct in determining acceptance of responsibility to post-plea conduct.

First of all, the majority's rule is directly contrary to the Guideline. The commentary to § 3E1.1 expressly directs the district court to look at conduct that in most cases would occur prior to plea. *See* U.S.S.G. § 3E1.1, cmt. n. 1 (2000) (directing the district court to appropriate considerations to determine whether a defendant qualifies for an acceptance of responsibility reduction). Among the considerations mentioned in the commentary are (2) "voluntary termination or withdrawal from criminal conduct or associations"; (4) "voluntary surrender to authorities promptly after commission of the offense"; (5) "voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense"; and (8) "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility." *Id.* It is difficult, indeed, to imagine how a defendant could clearly demonstrate acceptance of responsibility by either voluntary termination of criminal activity or voluntary surrender to the authorities without reference to his conduct prior to his indictment and guilty plea. *See id.* cmt. n. 1(b) & (d). The Guideline directs the district court to look at these factors to aid its credibility determination regarding the sincerity of the defendant's contrition evidenced by the guilty plea. For instance, the guilty plea of a defendant who voluntarily surrenders to authorities, promptly admits his culpa-

bility and expresses contrition is a more believable manifestation of acceptance of responsibility than that of a defendant who does not promptly admit culpability, refuses to cooperate with authorities and does not make his plea until shortly before his trial is scheduled to begin.

In addition, the Guideline commentary directs that a defendant can demonstrate "significant acceptance of responsibility" if she enters a guilty plea prior to trial, and admits, or does not falsely deny, any additional relevant conduct. *Id.* cmt. n. 3. "However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." *Id.* Further, a defendant who enters a guilty plea is not entitled to a reduction as a matter of right. *Id.* Importantly, there is no indication in the Guideline that the only relevant conduct is that which occurs after the guilty plea.

*Childers, Jeter,* and *Tilford* similarly do not support the majority's result. The majority holds that *"Jeter* and its progeny emphasize the importance of the entry of the guilty plea and the point of indictment as the relevant time frame for notice and acceptance of responsibility." Maj. Op. at 130. The problem with the majority's conclusion is that it divorces the holding of each case from the facts, when, in fact, the ruling of each case is not severable from its facts. For example, the majority quotes the following statement from *United States v. Rodgers:* "In *Jeter,* we held that the relevant time period for acceptance of responsibility does not begin until the date that federal authorities indict the defendant and he becomes aware that he is

---

The district court denied the acceptance of responsibility reduction, finding that even after Tilford was made aware of the investigation, he continued to conduct criminal activity and was not in any way deterred even though he had acknowledged responsibility.

*U.S. v. Tilford,* 224 F.3d 865, 866 (6th Cir. 2000). This Court held that the district court erred in relying on Tilford's criminal activity after his interview with the IRS agents because he did not accept responsibility at that time. *Id.* at 869.

subject to federal investigation and prosecution." 278 F.3d 599, 601 (6th Cir.2002); Maj. Op. at 130. The holding in *Jeter* was not this broad. Rather, in *Jeter*, the relevant time period for acceptance of responsibility did not begin until the date of the federal indictment *because* it was not until that date that Jeter was aware that he was under federal investigation and prosecution. *Jeter*, 191 F.3d at 641. Thus, we reversed the district court's denial of the acceptance of responsibility reduction because the district court relied on conduct that occurred before Jeter had *notice* of the federal investigation. *Id.* In so holding, we noted that "[h]ad Jeter confessed to federal authorities prior to the indictment or responded in some way to investigators to indicate his remorse or cessation of criminal activity like the defendant in *Childers*, the district court would be free to use that conduct to question the sincerity of his later acceptance of responsibility." *Id.*

Similarly, in *Tilford*, we reversed the district court's denial of acceptance of responsibility because the district court had mistakenly stated that Tilford had accepted responsibility at the time of his initial investigation. 224 F.3d at 866.[9] Relying on this factually erroneous assumption, the district court found that Tilford's continuing criminal activity was contrary to that acceptance and denied the reduction. *Id.* In fact, Tilford had not made any acceptance of responsibility at his initial investigation and did not do so *until* his federal indictment and guilty plea. *Id.* at 868. Therefore, in *Tilford*, acceptance of responsibility began at the time of the guilty plea. *Id.* There was nothing significant about the guilty plea *except* that it was at that point that Tilford first accepted responsibility.

Furthermore, neither *Jeter* nor *Tilford* "fence in" the ruling in *Childers* as the majority states. Maj. Op. at 129. In *Childers*, we affirmed the district court's denial of acceptance of responsibility based on the defendant's conduct *after* his confession to postal inspectors but *prior* to his arrest and plea. *Childers*, 86 F.3d at 565. *Jeter* and *Tilford* do not restrict *Childers*, in any way; rather, they clarify specific elements of the holding in *Childers*. *Jeter* clarified that the defendant must be on notice of a *federal* investigation before acceptance of responsibility could be in play. *See Jeter*, 191 F.3d at 641. *Tilford* clarified that the defendant must have made some admission or confession before acceptance of responsibility could be reviewed. *See Tilford*, 224 F.3d at 868. Both of these elements were present in *Childers*, as the defendant was on notice of the investigation when he was interviewed by the postal inspectors and he had admitted his conduct to those officers. *Childers*, 86 F.3d at 565. Nevertheless, the majority ignores the specific facts and holdings of these cases and determines that "since *Childers*, this Court has continued to stress the entry of the guilty plea and the indictment as primary to determining the moment at which a defendant first accepts responsibility." Maj. Op. at 129. As demonstrated above, however, the entry of the guilty plea and indictment were only relevant in *Jeter* and *Tilford* because of the specific facts of those cases.

Moreover, there is precedent in this Circuit, post *Jeter* and *Tilford*, that contradicts the majority's view of these cases.

---

9. The majority opinion suggests that in *Tilford* "this court reasoned that the defendant had insufficient notice of the federal prosecution to deny him the § 3E1.1 reduction." Maj. Op. at 128. This is inaccurate; the sole rea-

son for the reversal in *Tilford* was that Tilford had not accepted responsibility at the time of the initial investigation. Therefore, his continuing criminal activity could not be contrary to that acceptance.

In *United States v. Webb,* 335 F.3d 534 (6th Cir.2003) a case decided less than one year ago, this Court upheld the district court's denial of an acceptance of responsibility reduction based on *pre-plea* behavior that was inconsistent with acceptance of responsibility. *Id.* at 538. In *Webb,* the defendants, father and son, were put on notice of the federal government's interest in their activities when they were investigated by federal officers for drug trafficking. At the time of the initial search and investigation, Preston Webb admitted the offense to the officers. Nevertheless, the Webbs continued drug dealing. The probation officer determined that "Preston's ongoing criminal activity up to the time of his arrest in June was inconsistent with the acceptance of responsibility." *Id.* at 538. The district court denied the reduction and this Court affirmed the denial as not clearly erroneous. *Id.* at 539. Thus, the holding in *Webb* makes clear that consideration of inconsistent behavior prior to the guilty plea is permissible in assessing acceptance of responsibility.

The majority dismisses *Webb* on the grounds that

> *Webb* dealt narrowly with an issue of fact and applied a very deferential standard of review. The Sixth Circuit has continually declined to apply *Webb* to cases such as the matter *sub judice,* where the panel determines that an issue of law is present. *See e.g., United States v. Horn,* 355 F.3d 610, 613 (6th Cir.2004); *United States v. Tilford,* 85 Fed.Appx. 516, 518 (6th Cir.2004); *Rodriguez–Trujillo,* 84 Fed.Appx. 621, 625.

Maj. Op. at 129. This objection is disingenuous. First, all acceptance of responsibility cases deal narrowly with an issue of fact. Second, this Court has never declined to apply *Webb.* In *Webb,* the Court, following *Buford v. United States,* 532 U.S. 59, 121 S.Ct. 1276, 149 L.Ed.2d 197 (2001),

adopted the deferential clearly erroneous standard of review when reviewing the district court's application of the guidelines to uncontested facts in § 3E1.1 cases. *Webb,* 335 F.3d at 536–37. The cases cited by the majority as declining to apply *Webb* all cite *Webb* favorably for a proposition for which it stands, namely, that the district court's application of the guidelines to uncontested facts is reviewed for clear error. That these cases do not cite *Webb* for the standard of review on an issue of law is hardly surprising since the *Webb* Court did not speak to that issue.

The *Webb* Court did, however, speak to the precise issue in this case and the Court appropriately treated it as a matter of fact. The factual pattern in *Webb* is nearly identical to *Childers, supra.* Preston Webb was investigated regarding his criminal activity, confessed his wrongdoing, but then continued engaging in criminal behavior. *Webb,* 335 F.3d at 536, 538. This behavior, although occurring prior to the guilty plea, was inconsistent with the plea. Citing this pre-plea behavior, the district court denied the reduction. *Id.* at 538. We held that the district court did not err in denying the reduction. *Id.* Likewise, Hakley's behavior, prior to and after her guilty plea, was inconsistent with the guilty plea and the district court did not commit clear error in denying the reduction.

The majority's attempt to place the responsibility for its construction of a new rule on *Rodgers* is likewise unpersuasive. The majority states that

> [i]n *Rodgers,* this court unequivocally clarified the status of the law … The dissent disagrees with the interpretation of *Jeter* present in *Rodgers* and argues for a more narrow interpretation. However, the dissent is arguing a moot point—this Circuit already has followed a more broad interpretation of *Jeter.*

*See e.g., Rodgers,* 278 F.3d at 601; *Gregory,* 315 F.3d at 640.

Maj. Op. at 129 There are two problems with the majority's argument. First, as demonstrated previously, *Rodgers* misstated the holding of *Jeter.* Even assuming that it is proper to interpret precedent broadly or narrowly, the interpretation of *Jeter* present in *Rodgers* is not a "more broad interpretation of *Jeter";* it is inconsistent with the holding in *Jeter.*

Second, the comments in *Rodgers* regarding *Jeter* are not part of the holdings of *Rodgers.* Although the holding of this Court in a decision by another panel is binding precedent, this rule does not extend to dicta. *Johnson v. City of Cincinnati,* 310 F.3d 484, 493 (6th Cir.2002); *Stockler v. Garratt,* 893 F.2d 856, 859 n. 2 (6th Cir.1990). In *Rodgers,* the statements regarding *Jeter* appear in the procedural history section and in the analysis, in reference to a prior remand order. *See Rodgers,* 278 F.3d at 601–03. The holdings of the case relate to the scope of review on remand and reimposition of a sentence on remand. The specific holdings in *Rodgers* were that the district court was entitled to review the entire record on remand for sentencing, that reimposition of the original sentence did not give rise to a presumption of vindictiveness and that "imposition of the same sentence, without more, is insufficient to support a claim of actual vindictiveness." *Rodgers,* 278 F.3d at 603–05. Therefore, the statements in *Rodgers* regarding *Jeter* are not binding precedent.

Nor did this Circuit follow a "more broad interpretation of *Jeter"* in *United States v. Gregory,* 315 F.3d 637 (6th Cir. 2003), as the majority suggests. Neither *Jeter* nor *Rodgers* are mentioned in *Gregory.* The *Gregory* Court considered the relationship between obstruction of justice and acceptance of responsibility. The precise question before the Court was whether Gregory's circumstances were "extraordinary" such that he was entitled to a reduction for acceptance of responsibility despite his enhancement for obstruction of justice. *Gregory,* 315 F.3d at 639. The Court stated that, when determining whether a defendant had accepted responsibility after obstructing justice, appropriate considerations included truthful admission of the offense, voluntary assistance to authorities, and the timeliness of the affirmative acceptance of responsibility. *Id.* at 640. The Court concluded that Gregory's circumstances were extraordinary because he had never denied his own guilt, all the obstructive conduct predated the indictment, long before indictment, Gregory cooperated with officials, and finally he pleaded guilty and did not attempt to withdraw the plea. *Id.* at 641. *Gregory* says nothing about the proper "time scope" for acceptance of responsibility. *See id.*

Ironically, in finding acceptance of responsibility in this case, the majority itself looks to pre-plea conduct. For instance, in assessing Hakley's acceptance of responsibility, the majority notes that "[m]uch evidence suggests that Hakley accepted responsibility for her actions early-on: Before the federal government brought formal charges, Defendant Hakley told the government that she would plead guilty. She waived indictment. She agreed to provide restitution for all relevant conduct, not just the conduct related to the offense." Maj. Op. at 127. All of this evidence relates to *pre-plea* conduct.

Yet, the majority would allow the defendant to rely on such conduct, while preventing the district court from reviewing other inconsistent behavior during the same period. Even the subsequent quotation in the majority opinion stating that "[a]n acceptance of responsibility adjustment is generally awarded to a defendant who admits guilt in a timely-entered guilty

plea proceeding" undermines the majority's bright line rule. Reference to a "timely-entered guilty plea" is meaningless without reference to events that occurred *prior to the plea.*

As a matter of fact, if the majority adhered to its own rule, the district court must be affirmed. According to the majority, the only relevant time frame for assessing acceptance of responsibility is post-plea; therefore, the only permissible evidence before the district court would be the probation officer's presentence report and the recommendation letter of Lord. The presentence report recommended that Hakley not receive an acceptance of responsibility adjustment based on a credibility determination made by the probation officer during the presentence interview. The recommendation letter stated, on the other hand, that Hakley had accepted responsibility. Between these two pieces of evidence, the district court found the assessment in the presentence report to be credible but not the assessment in the recommendation of Lord. In regard to the probation officer, the district court stated that "as recently as last month, the probation officer believed that the defendant had not accepted responsibility and was not contrite." In making its determination regarding the recommendation of Lord, the district court specifically noted that the recommendation letter was directly contrary to her prior communication in Hakley's discharge summary. The district court stated

> Now [Lord] writes a letter, ... in which she essentially reverses her ap-

peal and says that, in fact, Ms. Hakley does understand the nature of her wrongdoing and is responsive to therapy....

> ....

> Well, what I do [sic] make of all that? I guess I have to decide that whether or not the writer of the report of the person describing herself as a counselor can be believed in either letter, I don't know how to resolve that at all. But I do know that in March this counselor said there was no acceptance of responsibility.

The sentencing transcript clearly reflects that the district court considered the report from Lord and dismissed it as not credible. As previously noted the district court was required to make this finding because Hakley had challenged the presentence report. *See* Fed.R.Crim.P. 32(i)(3)(B). The finding was not clearly erroneous. Consistently applying the majority's new rule, therefore, the district court's decision should be upheld, as it is supported by the relevant record.[10] There is also no indication that the district court's credibility assessment would have been different had it not considered pre-plea events or that its sentencing assessment would have changed if it based its determination of Hakley's sincerity only on the reports.

## IV.

Moreover, had the majority interpreted *Childers. Jeter,* and *Tilford* faithfully, the district court's determination should also

---

**10.** Indeed, the majority implicitly realizes that under its rule the district court opinion could stand. In footnote five, the majority states "[t]here is no reason to believe that the sentencing assessment would have been the same without the erroneous consideration of pre-plea conduct. Absent a clear statement from the sentencing judge that a permissible ground for denying the adjustment was suffi-

cient to support the sentencing, this Court cannot assume that the erroneous considerations ... were moot." Maj. Op. n. 5. As evidenced by the district court's credibility determinations regarding the presentence report and Lord's recommendation letter, it is not unsupported to conclude that the district court would have imposed the same sentence based solely on those reports.

be upheld. All that these precedents require is that the defendant be on notice that the federal government is interested in her illegal activity and that she have made some admission of guilt or acceptance of responsibility.

Gail Hakley was on notice that the federal government was interested in her actions. She was on supervised release after a conviction for bank embezzlement. As required by law, the terms of the supervised release mandated that she not "commit another Federal, State, or local crime during the term of supervision ..." 18 U.S.C. § 3583(d) (2003). In fact, the statutes says that *"[t]he court shall order,* as an explicit condition of supervised release, that the defendant not commit another Federal, State, or local crime during the term of supervision and that the defendant not unlawfully possess a controlled substance." (Emphasis added.) In other words, as a specific condition of her term of supervised release. Hakley was *ordered* not to commit another Federal. State, or local crime while on supervised release.

Furthermore, section 3583(f) of Title 18 of the United States Code provides that

[t]he court shall direct that the probation officer provide the defendant with a written statement that sets forth all the conditions to which the term of supervised release is subject, and that is sufficiently clear and specific to serve as a guide for the defendant's conduct and for such supervision as is required.

18 U.S.C. 3583(f).

To make sure that convicted felons comply with conditions imposed on supervised release, section 3603(f) of Title 18 of the United States Code requires close supervision of the defendant by a probation officer. It directs as follows:

A probation officer shall—

(1) instruct a probationer or a person on supervised release, who is under his supervision, as to the conditions specified by the sentencing court, and provide him with a written statement clearly setting forth all such conditions;

(2) keep informed, to the degree required by the conditions specified by the sentencing court, as to the conduct and condition of a probationer or a person on supervised release, who is under his supervision, and report his conduct and condition to the sentencing court;

(3) use all suitable methods, not inconsistent with the conditions specified by the court, to aid a probationer or a person on supervised release who under his supervision, and to bring about improvements in his conduct or condition;

(4) be responsible for the supervision of any probationer or a person on supervised release who is known to be within the judicial district;

(5) keep a record of his work, and make such reports to the Director of the Administrative Office of the United States Court as the Director may require;

(6) upon request of the Attorney General while on work release, furlough, or other authorized release from his regular place of confinement, or while in prerelease custody pursuant to the provisions of section 3624(c);

(7) keep informed concerning the conduct, condition, and compliance with any condition of probation, including the payment of a fine or restitution of each probationer under his supervision and report thereon to the court placing such person on probation and report to the court any failure of a probationer under his supervision to pay a fine in default within thirty days after notification that it is in default so that the court may determine whether probation should be revoked;

(8) (A) when directed by the court, and to the degree required by the regimen

of care or treatment ordered by the court as a condition of release, keep informed as to the conduct and provide supervision of a person conditionally released under the provisions of section 4243 or 4246 of this title, and report such person's conduct and condition to the court ordering release and to the Attorney General or his designee; and

(B) immediately report any violation of the conditions of release to the court and the Attorney General or his designee;

(9) if approved by the district court, be authorized to carry firearms under such rules and regulations as to Director of the Administrative Office of the United States may prescribe; and

(10) perform any other duty that the court may designate.

18 U.S.C. § 3603 (2004).

In short, it seems to me that an express, court-ordered and statutorily mandated command not to commit another crime while under the direct, close, and detailed supervision of federal authorities for a specified period of years, was a rather clear indication to Hakley that the federal authorities were interested in her illegal activities. In light of this detailed statutory regime, the majority's analogy to Everyman honest citizen is more than a bit facile.

By committing the instant offense, Hakley violated her supervised release. Indeed, she received a sentence for a supervised release violation on the same day as her sentence for the instant offense. At the very least, because she was on supervised release, Hakley was on constructive notice that the federal government was interested in her activities. *See id.* Moreover, there was testimony that Hakley's employer, Ms. Belser, was contacted by the probation office regarding the potential risk posed by Hakley in Hakley's presence, lending further weight to the fact. that

Hakley knew, or should have known, that her activities were of interest to the federal government. Indeed, there is no ground. to contend that Hakley was unaware of the fact that the federal government was interested in her behavior.

The second requirement is that the defendant make some admission of guilt or acceptance of responsibility. *See Tilford,* 224 F.3d at 867–68 ("Tilford did not accept responsibility when the IRS agents first interviewed him in 1993. Tilford's subsequent criminal activity therefore cannot qualify as 'criminal conduct that continues following an acceptance of responsibility' . . . ."). Neither *Tilford* nor any other precedent requires that "an acceptance of responsibility" be an admission made to an officer of the federal government. In this case, Hakley, while on notice that the federal government was interested in her behavior because of her supervised release, confessed responsibility for her actions three times: when confronted by her employer's son, in a letter to her employer, and when questioned by the state authorities. All the requirements in this case were fulfilled. Hakley was on notice and she had made a statement of acceptance of responsibility. Nevertheless, she persisted in her illegal activity by stealing from her own daughter.

In addition to the continuation of illegal activity following her admission, the record contains evidence from Hakley's counselor that she did not accept responsibility and the probation officer's report, in which the officer doubted Hakley's sincerity based upon observation. Hakley's continuation of illegal activity after her initial acceptance of responsibility is inconsistent with her guilty plea. It is evidence that she did not voluntarily terminate her criminal conduct. *See Childers,* 86 F.3d at 563–64. The impressions of Hakley's counselor and the probation officer are also evidence of her insincerity. The district court was

entitled to rely on all the information before it in assessing the sincerity, or lack thereof, of the defendant's claimed acceptance of responsibility. Even under the rubric formulated by *Childers, Jeter,* and *Tilford,* the district court did not commit clear error.

## V.

The majority opinion today constructs a bright line rule, the practical effect of which is an automatic grant of the acceptance of responsibility reduction to any defendant who pleads guilty. If all the district court is entitled to review is pre-plea behavior that is favorable to a defendant and post-plea conduct, all defendants will receive an acceptance of responsibility reduction by the mere fact of the guilty plea. Indeed, the majority opinion almost *requires* a defendant to commit a related offense subsequent to his guilty plea in order to lose the acceptance of responsibility reduction.[11] This result is directly contrary to the Guideline which clearly states that the guilty plea is significant evidence of acceptance of responsibility not a golden ticket. *See* U.S.S.G. § 3E1.1. cmt. n. 3.

> Entry of a plea of guilty prior to the commencement of trial ... will constitute *significant evidence* of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. *A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.*

*Id.* (emphasis added). By restricting the sphere of conduct available to the district court, the majority opinion leaves little room for the evidence of the guilty plea to be "outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility."

Entry of a guilty plea may be desirable to reduce unnecessary trials and conserve judicial economy, however, the Sentencing Commission did not choose to make entry of the guilty plea synonymous with acceptance of responsibility. Instead, the Guideline requires the defendant to demonstrate clearly acceptance of responsibility for his offense. *See* U.S.S.G. 3E1.1. Thus, the district court's determination whether the defendant has clearly demonstrated acceptance of responsibility is inherently a credibility determination.

While we have decided, in this Circuit, that it is not appropriate for the district court to base its credibility determination, in whole or in part, on the prior criminal acts of a defendant,[12] it is entirely proper for the district court to base its credibility determination on the defendant's proclivity for falsehood. The defendant's failure to express contrition for past criminal acts would say nothing about her current acceptance of responsibility. The defendant's failure to express *true contrition* for past criminal or other acts, on the other hand, speaks volumes about the sincerity of her instant expression of contrition. Certainly, a defendant may be truly repentant for her crime even though she has not been repentant in the past, but the burden of clearly demonstrating that repentance falls on the defendant. In this case, Hakley did not meet her burden; the district court's judgment was well founded and not clearly erroneous.

---

11. Since, in most cases, a defendant is in custody following the guilty plea, the reduction would, therefore, be automatic. A defendant in custody has little opportunity to commit offenses. Even a defendant who is not custody will virtually have to try to lose acceptance of responsibility under this pro-defendant interpretation of precedent.

12. *See United States v. Morrison,* 98 F.2d 730 (6th Cir.1993); *United States v. Banks,* 252 F.3d 801 (6th Cir.2001).

Finally, a district court does not act nefariously when it assesses a defendant's credibility. To put two truisms together here, the hard cold truth is that sometimes people don't really mean what they say, and that actions speak louder than words. That is all that the district court found here—it made a fact finding that Hakley did not really mean what she said, as based upon the presentence officer's impressions and as reflected by Hakley's recent pattern of expressing contrition but at the same time continuing to behave in a (criminal) manner completely inconsistent with her statements of remorse.

For all of the foregoing reasons, I respectfully DISSENT.