RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0043p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　*Plaintiff-Appellee*,

　　*v.*

IMARI C. GLOVER, aka Omar Glover,

　　　　　*Defendant-Appellant*.

No. 24-5806

Appeal from the United States District Court
for the Eastern District of Tennessee at Chattanooga.
No. 1:20-cr-00075-1—Curtis L. Collier, District Judge.

Argued: January 28, 2026

Decided and Filed: February 17, 2026

Before: GILMAN, GRIFFIN, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Terra L. Bay, Chattanooga, Tennessee, for Appellant. Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Terra L. Bay, Chattanooga, Tennessee, for Appellant. Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

_____

## OPINION

_____

GRIFFIN, Circuit Judge.

Defendant Imari C. Glover robbed a Cash Express with help from his then-girlfriend, Shelby Beam. He pleaded guilty to Hobbs Act robbery. Eleven days after signing his plea agreement, an image of a rat in the crosshairs of a riflescope was posted on his Facebook profile.

At sentencing, the district court enhanced Glover's Guidelines range because the robbery involved a "financial institution," as contemplated in the Guidelines, and because Glover acted in a leadership role when carrying out the robbery. The district court denied Glover an acceptance of responsibility reduction because of the rat picture. Glover was sentenced to 188 months' imprisonment—the top of his Guidelines range.

On appeal, Glover argues that the Cash Express is not a "financial institution" under the Guidelines and that he did not lead the robbery. He further argues that his plea agreement entitled him to an acceptance of responsibility reduction and that his sentence is substantively unreasonable. We disagree and affirm.

I.

On March 7, 2020, Glover robbed a Cash Express—a "non-bank provider of check cashing services, prepaid debit cards, and short-term lending products including [a] flexible line of credit . . . [and] title and pawn loans"—with codefendant and then-girlfriend, Beam. Beam entered the business while Glover remained outside. Beam engaged with the clerk under the guise of securing a loan. She then told the clerk that she needed to return to her vehicle to retrieve some identification. As Beam left, she held the door open so that Glover could rush in. Glover jumped the counter and brandished a pistol at the clerk. Glover then placed the clerk in a chokehold and demanded that she open the safe. The clerk complied. Glover left the Cash Express with $2,680.

Two days later, officers initiated a stop of a vehicle registered to Beam. The car sped off, and the officers pursued. After the vehicle eventually came to a stop, the driver, later identified as Glover, fled on foot, leaving Beam behind in the car. Later that day, Beam implicated herself and Glover in the Cash Express robbery. Beam told officers that she feared Glover would assault her, as he had done in the past, so she had done what Glover told her to do. Glover was later arrested.

Glover was charged with being a felon in possession of a firearm (Count I), Hobbs Act robbery (Count II), brandishing a firearm during a crime of violence (Count III), and retaliating against a federal witness (Count IV). Pursuant to a written plea agreement, Glover pleaded

guilty to committing Hobbs Act robbery. The plea agreement stipulated that, at sentencing, the government would not oppose a two-level reduction for acceptance of responsibility under § 3E1.1(a) of the Guidelines, and, if applicable, would recommend a one-level reduction under § 3E1.1(b). The plea agreement included a caveat that the government would not be held to either condition if Glover engaged in "any conduct or ma[d]e any statements that are inconsistent with accepting responsibility for [his] offense(s)."

Eleven days after signing the agreement, Glover's Facebook cover photo was updated to an image of a rat in the crosshairs of a riflescope:



Glover has several aliases, including Omar.

A probation officer then prepared Glover's presentence report (PSR). From a base offense level of 20, the PSR included a two-level enhancement because Cash Express was a "financial institution," a six-level enhancement because Glover brandished a firearm during the robbery, and a two-level enhancement because Glover physically restrained the store clerk during the robbery. Further, the PSR added two levels because Glover acted in a leadership role during the robbery, two levels for obstruction of justice based on Glover's text threats against Beam, and an additional two levels for obstruction of justice based on the March 9 vehicular

pursuit.  After all these enhancements, Glover's total offense level was 36.  The PSR did not apply a three-level acceptance of responsibility adjustment.

With a total offense level of 36 and a criminal history category of III, the PSR calculated Glover's Guidelines sentencing range as 235 to 293 months.  But because the statutory maximum sentence for Count II is 240 months, the effective Guidelines range recommended by the PSR was 235 to 240 months.

At sentencing, the district court rejected Glover's objection to the PSR's finding that the Cash Express was a "financial institution" within the meaning of § 2B3.1(b)(1) of the Guidelines.  The district court also rejected Glover's objections to the PSR's denial of an acceptance of responsibility reduction and its application of the leadership enhancement.  But the district court sustained two objections in Glover's favor:  it declined to apply an enhancement for obstruction of justice based on Glover's threatening texts to Beam in October 2020 or a reckless endangerment enhancement based on the vehicular pursuit.  The district court then calculated the Guidelines range to be 151 to 188 months.  The district court imposed 188 months of imprisonment.  Glover appealed.

II.

Glover first argues that the Cash Express is not a "financial institution" under § 2B3.1(b)(1) of the Guidelines.  We review de novo legal interpretations of the Guidelines. *United States v. Sands*, 948 F.3d 709, 712–13 (6th Cir. 2020).

A two-level enhancement applies for a robbery offense if "the property of a financial institution or post office was taken."  U.S.S.G. § 2B3.1(b)(1).  Section 2B3.1(b)(1) does not define "financial institution."  When construing the Guidelines, "we employ the traditional tools of statutory interpretation, beginning with the text's plain meaning." *United States v. Babcock*, 753 F.3d 587, 591 (6th Cir. 2014).  If the language is unambiguous, our analysis ends there. *Sands*, 948 F.3d at 713.  We begin with the dictionary definition of the term or phrase at issue. *Id.*

A "financial institution" is a "business, organization, or other entity that manages money, credit, or capital, such as a bank, credit union, savings-and-loan association, securities broker or dealer, pawnbroker, or investment company." *Financial Institution*, *Black's Law Dictionary* (12th ed. 2024); s*ee also Financial Institutions*, *Black's Law Dictionary* (6th ed. 1990) (similar). This broad definition plainly encompasses Cash Express businesses. After all, Cash Express is a stereotypical payday lender that provides loans and check cashing services. In other words, Cash Express is a "business . . . that manages money, credit, or capital," with its primary offerings being financial in nature. Thus, it is a financial institution, under the plain meaning of the term, and our analysis need not go any further. *See Sands*, 948 F.3d at 713.

Two other circuit courts have reached the same conclusion on this issue. The Seventh Circuit held that "a business that offers an array of financial services, including check cashing, money transfers, money orders, and loans, surely fits within the plain meaning of the term 'financial institution.'" *United States v. Cook*, 850 F.3d 328, 333 (7th Cir. 2017). There, the defendant had robbed a "check cashing company," not a conventional bank, that offered a variety of "financial services including check cashing, money transfers, money orders, bill payments, and short-term loans." *Id.* at 332. Similarly, the Fourth Circuit held that an "agent of Western Union [that] routinely cashes out-of-state checks"—was a "financial institution" within the meaning of § 2B3.1(b)(1). *United States v. Sansosti*, 2022 WL 519936, at *2 (4th Cir. Feb. 22, 2022) (per curiam).

Yet Glover insists that we should adopt a different definition, the one found in 18 U.S.C. § 20, which defines "financial institution" as:

(1) an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act);

(2) a credit union with accounts insured by the National Credit Union Share Insurance Fund;

(3) a Federal home loan bank or a member, as defined in section 2 of the Federal Home Loan Bank Act (12 U.S.C. 1422), of the Federal home loan bank system;

(4) a System institution of the Farm Credit System, as defined in section 5.35(3) of the Farm Credit Act of 1971;

(5)  a small business investment company, as defined in section 103 of the Small Business Investment Act of 1958 (15 U.S.C. 662);

(6)  a depository institution holding company (as defined in section 3(w)(1) of the Federal Deposit Insurance Act;

(7)  a Federal Reserve bank or a member bank of the Federal Reserve System;

(8)  an organization operating under section 25 or section 25(a) of the Federal Reserve Act;

(9)  a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978); or

(10)  a mortgage lending business (as defined in section 27 of this title) or any person or entity that makes in whole or in part a federally related mortgage loan as defined in section 3 of the Real Estate Settlement Procedures Act of 1974.

In short, something more like a conventional bank regulated by a federal agency.

But nothing in § 2B3.1(b)(1) indicates that we should adopt the definition from § 20. Courts are entitled to assume "terms bear their ordinary meaning" absent some suggestion to the contrary. *Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021). Moreover, had the Sentencing Commission wanted to limit the definition of "financial institution" to that of § 20, it could have done so explicitly. *See, e.g.*, *United States v. Nash*, 558 F. App'x 599, 604–05 (6th Cir. 2014) ("[T]he reference to an adult sentence in § 4A1.2 indicates the Sentencing Commission could have specified . . . but did not."). Indeed, the Guidelines define "financial institution" elsewhere, with explicit reference to § 20, among other statutes. *See* U.S.S.G. § 2B1.1, cmt. n.1. The Commission's decision not to define "financial institution" in § 2B3.1(b)(1) supports our conclusion that the plain meaning of the term in this section suffices.

Glover argues that using the plain meaning of "financial institution" would lead to absurd results because department stores that offer credit cards, or some other nominal financial service, could be swept up in the definition. But an entity with a primary purpose in retail sales is easily distinguished from entities that primarily engage in money lending or other financial services, like Cash Express. *Cf. Cook*, 850 F.3d at 332–33 (rejecting the argument that financial institutions must serve a depository function because otherwise the term would be too broad).

Because we find no basis to incorporate the definition of "financial institution" from § 20, and that § 2B3.1(b)(1) uses the plain meaning of the term instead, we conclude that the district court properly applied the two-level enhancement to Glover. Businesses that are *primarily* engaged in an array of financial services, like Cash Express, are "financial institutions" as used in § 2B3.1(b)(1).

## III.

Glover next argues that he was not in a leadership role when he and Beam robbed the Cash Express. We review the district court's factual findings about Glover's activities for clear error and its legal conclusion that an enhancement applies de novo. *United States v. Hills*, 27 F.4th 1155, 1193 (6th Cir. 2022). Because Glover's challenge is factual in nature, our review is deferential. *United States v. Washington*, 715 F.3d 975, 982–83 (6th Cir. 2013) (citing *Buford v. United States*, 532 U.S. 59, 66 (2001)).

The Guidelines account for who did what when crimes are carried out by a group. A two-level enhancement applies when a defendant was "an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). Typically, "a defendant must have exerted control over at least one individual" for the enhancement to apply. *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000) (quoting *United States v. Gort-Didonato*, 109 F.3d 318, 321 (6th Cir. 1997)). "Merely playing an essential role in the offense is not equivalent to exercising managerial control over other participants." *Id.* at 811–12 (citation modified).

Relevant factors include whether the defendant "exercised decisionmaking authority, recruited accomplices, received a larger share of the profits, was instrumental in the planning phase of the criminal venture, or exercised control or authority over at least one accomplice." *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (citing *United States v. Lalonde*, 509 F.3d 750, 765–66 (6th Cir. 2007)). Importantly, "[a] district court need not find each factor in order to warrant an enhancement." *United States v. Castilla-Lugo*, 699 F.3d 454, 460 (6th Cir. 2012) (citing *United States v. Gates*, 461 F.3d 703, 709 (6th Cir. 2006)). The burden of proof— preponderance of the evidence—rests on the government. *Vandeberg*, 201 F.3d at 811.

Here, Glover acted in a leadership role when he and Beam robbed the Cash Express. First, he "exerted control" over Beam through fear. *Id.* (quoting *Gort-Didonato*, 109 F.3d at 321). Beam told investigators that she assisted Glover in the robbery, that he told her what to do, and that she did it out of fear of his abuse. Beam corroborated this by providing law enforcement with pictures of herself that showed injuries from Glover's previous assaults, which included marks and bruises on her body.

Second, Glover "exercised decisionmaking authority" during the robbery. *Vasquez*, 560 F.3d at 473. The morning of the robbery, Glover instructed Beam to "wait for my txt . . . Befo u pull up." After instructing Beam to "Head that way bby," Glover told Beam to "Go n bby." *Cf. Vandeberg*, 201 F.3d at 811 (finding the leadership enhancement was improperly applied when the defendant did not recruit or exercise authority over a codefendant). Glover counters that the texts "read more like two people coordinating" so that neither would spend too long in front of the store. But Glover's read of the texts ignores that he was the only one providing instructions.

Third, the robbery itself suggests that Glover acted in a leadership role. Beam merely opened the door for Glover. Glover rushed in, jumped the counter, and brandished a pistol at the clerk. Glover placed the clerk in a chokehold and demanded that she open the safe. And Glover left the store with the cash. Glover's control over Beam permitted him to carry out the most instrumental and violent portions of the robbery.

Relying on *United States v. Parker*, 3 F. App'x 406 (6th Cir. 2001), Glover attempts to distinguish his case on the ground that his conduct was not enough to warrant the enhancement. In *Parker*, we found the enhancement applied because that defendant selected the bank to rob, recruited the crew, rented the getaway car, and rented the motel room that the crew fled to after the robbery. *Id.* at 408–09. Although *Parker* certainly illustrates a more straightforward application of the leadership enhancement, a district court need not find each factor present to find that the enhancement was appropriate. *Castilla-Lugo*, 699 F.3d at 460. Glover similarly "exercised control or authority over at least one accomplice," and his role in the robbery was "instrumental." *Vasquez*, 560 F.3d at 473. Thus, the district court properly applied the two-level leadership enhancement to Glover.

IV.

Glover next argues that the district court erred in not applying an acceptance of responsibility reduction based on his plea agreement and that the government breached the plea agreement by failing to move for an acceptance of responsibility reduction.

A.

We review the district court's denial of the acceptance of responsibility reduction for clear error. *United States v. Merritt*, 102 F.4th 375, 379, 381 (6th Cir. 2024). A defendant may be entitled to a two-level reduction if he "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). "Entry of a plea of guilty . . . combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable . . . will constitute significant evidence of acceptance of responsibility." U.S.S.G. § 3E1.1, cmt. n.3. But defendants are "not entitled to an adjustment under this section as a matter of right," and "conduct of the defendant that is inconsistent with such acceptance of responsibility" may outweigh any evidence to the contrary. *Id.* A defendant bears the burden of proving the reduction should be applied. *Merritt*, 102 F.4th at 381.

The district court properly relied on the rat picture posted on Glover's Facebook page to find that he was not entitled to the reduction. The district court correctly found that "crosshairs generally means that you're going to fire at that particular target." And here that target was a rat, which is a colloquial term for a government witness. As for whether Glover posted the picture himself despite being incarcerated, the court explained that "it's pretty common knowledge that cell phones are pretty prevalent in all of our correctional institutions . . . [s]o it's not out of the realm of possibility that Mr. Glover had a cell phone himself." The court also offered an alternative explanation, indicating that Glover could have directed someone to post the picture. The district court concluded that posting the rat picture amounted to an obstruction of justice and

that Glover had threatened Beam.**[1]** An obstruction of justice finding is sufficient to deny an acceptance of responsibility reduction. *See, e.g.*, *United States v. Kamper*, 748 F.3d 728, 744–45 (6th Cir. 2014) (finding "witness intimidation" sufficient to uphold the district court's decision to withhold an adjustment for acceptance of responsibility).

Glover challenges this finding. First, he maintains that there was no evidence in the record that he had access to a cell phone or Facebook while incarcerated. But he has offered no evidence that he did not post the rat picture. Moreover, Glover did not rebut the district court's reasonable inferences that he could have directed someone to post the photo or that he had access to a phone while in jail. After all, he was previously found with a phone while incarcerated. Second, he opines that it makes little sense for a defendant awaiting his sentence to post such a provocative photo. But this argument asks that we substitute our judgment of the facts when there is no basis in the record to do so. And at any rate, the district court's findings were just as, if not more, plausible.

Next, Glover argues that his conduct was not sufficiently related to the crime underlying the guilty plea. He cites *United States v. Morrison*, 983 F.2d 730, 735 (6th Cir. 1993), where we vacated a sentence because the district court denied an acceptance of responsibility reduction for "unrelated criminal conduct." Morrison had pleaded guilty to receipt and possession of a firearm by a felon. *Id.* at 731. While on bond, he was arrested for attempted theft and constructive possession of firearms, and he had tested positive for a controlled substance. *Id.* at 733. We held that it was error for the sentencing court to consider conduct "unrelated" to the underlying criminal conduct when applying the acceptance of responsibility reduction. *Id.* at 735. But we also explicitly carved out exceptions for conduct that "may be *related to actions toward government witnesses* concerning the underlying offense . . . or may *involve an otherwise strong link* with the underlying offense." *Id.* The Facebook photo here was designed to intimidate a

---

**[1]**To clarify, this obstruction of justice finding was distinct from the two obstruction findings that were included in the PSR. The obstruction of justice finding based on the rat picture did not serve as a standalone two-level enhancement but was instead the factual predicate to withhold the acceptance of responsibility reduction.

government witness, Beam.  It was also fairly linked to the underlying offense:  Glover used fear to control Beam.  Glover's argument therefore fails.**[2]**

We conclude that withholding the acceptance of responsibility reduction was not clearly erroneous, especially considering the standard of review and the "great deference" it affords. *Merritt*, 102 F.4th at 381.

B.

We review Glover's argument regarding the government's alleged breach for plain error because he did not press that argument below.  *See United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004).  Against this demanding standard, Glover must identify an error by the district court that was "obvious or clear" and affected both his "substantial rights" and the proceeding's "fairness, integrity, or public reputation."  *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (citation modified).  Plea agreements are contractual in nature, so we use traditional principles in their interpretation and enforcement.  *United States v. Villareal*, 491 F.3d 605, 608 (6th Cir. 2007).  We assess their plain language and look to the agreement as a whole. *United States v. Beals*, 698 F.3d 248, 256 (6th Cir. 2012).  And we hold the government to "meticulous standards of performance."  *United States v. Moncivais*, 492 F.3d 652, 662 (6th Cir. 2007) (quoting *United States v. Vaval*, 404 F.3d 144, 152–53 (2d Cir. 2005)).

Glover's plea agreement provided that the government would not oppose a reduction for acceptance of responsibility under § 3E1.1(a) of the Guidelines at sentencing so long as he did not "engage in any conduct . . . inconsistent with accepting responsibility."  Under the plea agreement's terms, our inquiry turns on whether Glover engaged in conduct or made statements that permitted the government to oppose the reduction.  As discussed previously, the rat picture

---

**[2]**Before oral argument, Glover filed a letter of supplemental authority related to *United States v. Hawkins*, 165 F.4th 442 (6th Cir. 2026).  There, we reversed a district court for "relying on [a co-conspirator's] scant, uncorroborated, and out-of-court statement[s] to estimate the bulk of the drugs attributable to Hawkins, resulting in a procedurally unreasonable sentence." *Id.* at 454.  Glover asserts that his role enhancement and the denial of his acceptance of responsibility reduction were based "solely" on Beam's uncorroborated statements.  But *Hawkins* is inapposite here because Beam's statements were corroborated by the pictures illustrating Glover's past abuse, their text messages, and the posted rat picture.

was a sufficient indicator of a rejection of responsibility.  Thus, the government did not breach the plea agreement.

Glover also argues that the government's position rests on an unlikely assumption that Beam saw the rat picture on his Facebook page.  Regardless of whether Beam saw the picture, the act of posting it still evidences a lack of remorse and a rejection of responsibility.  And nothing in the plea agreement can be construed as requiring a government witness to perceive a threat in order for it to be considered conduct inconsistent with an acceptance of responsibility.

## V.

Finally, Glover challenges the procedural and substantive reasonableness of his sentence. He argues that the district court did not explain why it sentenced him to the top of the Guidelines and that his sentence is too long because it is tenfold his codefendant's sentence.  "We review a district court's sentence for both procedural and substantive reasonableness using the deferential abuse-of-discretion standard." *United States v. Evers*, 669 F.3d 645, 661 (6th Cir. 2012).

When reviewing a sentence for procedural reasonableness, we "ensure that the district court committed no significant procedural error, such as failing . . . to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007).  As for substantive reasonableness challenges, a district court abuses its discretion if it "arbitrarily selected the sentence, based the sentence on impermissible factors, failed to consider pertinent § 3553(a) factors, or gave an unreasonable amount of weight to any pertinent factor." *United States v. Robinson*, 892 F.3d 209, 213 (6th Cir. 2018) (quoting *United States v. Cunningham*, 669 F.3d 723, 733 (6th Cir. 2012)).  We apply a rebuttable presumption that a within-Guidelines sentence is reasonable. *Vonner*, 516 F.3d at 389–90.

## A.

Glover argues that the district court did not explain why it sentenced him to the top end of the Guidelines range and so a resentencing is in order.  When, as here, the defendant failed to object after imposition of the sentence, we again review for plain error.  The district court did not so err.

Although the district court quickly recited the § 3553(a) factors and announced a top-of-Guidelines sentence, it did not need to give "the reasons for rejecting any and all arguments by the parties for alternative sentences" or "the specific reason" for a within-Guidelines sentence. *Vonner*, 516 F.3d at 387. The "law leaves much . . . to the judge's own professional judgment." *Rita v. United States*, 551 U.S. 338, 356, 359 (2007) ("Where a matter is as conceptually simple as in the case at hand and the record makes clear that the sentencing judge considered the evidence and arguments, we do not believe the law requires the judge to write more extensively."). And here, the "context and the record make clear" that the district court considered the § 3553(a) factors. *Id.* at 359. The district court recited the factors, noted the seriousness of the offence, and imposed a sentence to "promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to this type of criminal conduct so that others who might be tempted to engage in this conduct will not do so, and to protect the public from future crimes of Mr. Glover." A within-the-Guidelines sentence announced in a terse manner is not necessarily unreasonable. *See, e.g.*, *United States v. Scott*, 2025 WL 3014259, at *4 (6th Cir. Oct. 28, 2025). And it was not unreasonable here.

B.

Beam's sentence does not demonstrate that Glover's is unreasonable. We have explained that § 3553(a)(6) "concerns *national* disparities between defendants with similar criminal histories convicted of similar criminal conduct—not disparities between codefendants." *United States v. Bass*, 17 F.4th 629, 636 (6th Cir. 2021) (quoting *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008)). Nonetheless, the difference in sentencing is easily accounted for by Glover's use of a firearm during the robbery, his leadership role, his post-plea conduct, and his storied criminal history—none of which applied to his codefendant. Glover was unable to move for the same departures that Beam did. So Beam's shorter sentence does not make Glover's unreasonable.[3]

---

[3]Glover's final argument is that much of his criminal history occurred when he was a teenager, so he "may have been warranted a downward departure under" § 5H1.1. Even though he did not request this downward departure in the lower court, he asks, without citation to any authority, that we remand for resentencing "in light of this amendment." We find this argument unavailing. *See United States v. Roser*, 529 F. App'x 450, 454 (6th Cir.

## VI.

For these reasons, we affirm the judgment of the district court.

---

2013) ("[W]hen a defendant fails to raise a specific mitigating factor at sentencing, the district court's failure to consider the unargued factor is not an abuse of discretion.").